# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

FREDERICK DIONTAE MORROW, )
)
    Petitioner, )    No. 3:06-0955
)    JUDGE HAYNES
)
WAYNE BRANDON, Warden, )
)
    Respondent. )

## M E M O R A N D U M

Petitioner, Frederick Diontae Morrow, filed this pro se action under 28 U.S.C. § 2254

seeking the writ of habeas corpus to set aside his state court convictions for felony murder,

attempted aggravated kidnaping and civil rights intimidation, for which he received a sentence of

life imprisonment plus nine years. After review of the petition, the Court appointed the Federal

Public Defender to represent Petitioner and an amended petition was filed. In his amended petition,

Petitioner asserts the following claims: (1) that the State's proof was insufficient for Petitioner's

attempted kidnapping and felony murder convictions in violation of the Due Process Clause of

the Fourteenth Amendment; (2) that although consistent with state law at the time of Petitioner's

trial, the state trial court's failure to consider lesser included offenses to felony murder is contrary

to the subsequent decision in State v. Butler, 6 S. W.3d 453, 464 (Tenn. 1999) and thus violates

the Due Process Clause of the Fourteenth Amendment; and (3) that the state trial judge's failure

to disclose threats to his personal safety prior to trial deprived Petitioner of a fair trial in violation

of the Due Process Clause of the Fourteenth Amendment. (Docket Entry No. 12, Amended

Petition at 1-2).

## A. Procedural History

### 1. The State Courts

After a January 1996 bench trial, Petitioner was convicted of felony murder, attempted aggravated kidnaping and civil rights intimidation. On December 22, 1998, the Tennessee Court of Criminal Appeals affirmed his convictions and sentence. State v. Morrow, 1998 WL 917802 (Tenn. Crim. App. Dec. 22, 1998). On June 15, 1999, Petitioner submitted a late-filed application for permission to appeal to the Tennessee Supreme Court. (Docket Entry No. 17-15, -16). On May 15, 2000, the Tennessee Supreme Court denied the application as untimely, but remanded the action for further proceedings under Tennessee's Post-Conviction Act, Tenn. Code Ann. § 40-30-201, et seq. (Docket Entry No. 17-18). On November 11, 2002, Petitioner filed his state post-conviction petition and a late filed application for permission to appeal. (Docket Entry No. 17-19). On November 15, 2004, the Supreme Court denied the application for permission to appeal. (Docket Entry No. 17-20). The trial court denied Petitioner's petition for post conviction relief and on appeal, the Tennessee Court of Criminal Appeals affirmed. (Docket Entry No. 17-25).

### 2. The Federal Action

#### a. Petitioner's Initial Proceeding

In earlier proceedings, Respondent challenged this petition as untimely under the federal habeas statute of limitations. Citing the dates of the state appellate courts' orders and rules, Respondent argued that Petitioner's federal habeas limitations period commenced on February 22, 1999, that is 60 days after the Tennessee Court of Criminal Appeals affirmed Petitioner's convictions and sentences. Respondent contended that during this period, Petitioner could have applied to the Tennessee Supreme Court for permission to appeal under Tenn. R. App. P. 11. The

2

sixty (60) day period for filing an application for permission to appeal is jurisdictional and may not be extended. See Tenn. R. App. P. 2 and 21(b); State v. Sims, 626 S.W.2d 3 (Tenn. 1981). Thus, Respondent also contended that the one-year period to file a federal habeas corpus petition began to run on February 22, 1999. Absent a qualifying State proceeding under the AEDPA, Respondent asserted that Petitioner's federal habeas petition had to be filed by February 23, 2000. Petitioner filed this action on September 6, 2006 and his amended petition was filed on April 23, 2007.

In response, Petitioner asserted that the Respondent erroneously calculated the limitations period and alternatively, Petitioner was entitled to equitable tolling of the federal habeas statute of limitations.(Docket Entry No. 24). Petitioner argued that during the 1999-2000 time period, Petitioner believed his counsel was pursuing his direct appeal. Petitioner also cited the destruction of his counsel's office in a tornado in January 1999 and his counsel's "misguided efforts to rectify the situation by filing improper Rule 11 pleadings." (Docket Entry No. 24, Petitioner's Response at p. 13). Petitioner contends that his direct appeal was not concluded until the Tennessee Supreme Court's November 15, 2004 Order denying his late Rule 11 application. Petitioner correctly cited that in a state post-conviction proceeding, the Respondent conceded that Petitioner should be allowed a delayed appeal.

Respondent filed a reply (Docket Entry No. 31) contending, in sum, that however the limitations period is calculated, this action remains untimely because assuming Petitioner's late-filed application for permission to appeal is a qualifying state court action under AEDPA, on May 15, 2000, the Tennessee Supreme Court denied Petitioner's first late filed application.

After a review of the state record, the Court concluded that between May 15, 2000 and November 2002, Petitioner did not have a pending state court action. (Docket Entry Nos. 46 and 47, Memorandum and Order). Petitioner did not file his State post-conviction petition until

3

November 18, 2002. Id. Under <u>Vroman v. Brigano</u>, 346 F.3d 598, 602 (6th Cir. 2003), without a timely state post-conviction petition, the Court concluded that there was not any tolling of the federal habeas statute of limitations and this action was untimely under 28 U.S.C. § 2244(d). Id.

Petitioner then filed a motion to reconsider citing the Court's failure to address , <u>Jimenez v. Quartermaster</u>, 555 U.S. 113, 121 (2009) ( "We hold that, where a state court grants a criminal defendant the right to file an out-of-time direct appeal during state collateral review, but before the defendant has first sought federal habeas relief, his judgment is not yet "final" for purposes of § 2244(d)(1)(A). In such a case, "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review" must reflect the conclusion of the out-of-direct appeal, or the expiration of the time for seeking review of that appeal"). The Court granted that motion and gave the parties time to submit proof. (Docket Entry Nos. 49 and 53). Later, Petitioner filed a motion for a hearing in light of <u>Martinez v. Ryan</u>,132 S. Ct. 1309, 1318 (2012). (Docket Entry Nos. 57 and 63) and the Court set an evidentiary hearing on both motions. (Docket Entry No. 64)

### b. Petitioner's <u>Jimenez</u> and <u>Martinez</u> Motions

For his reliance on <u>Jimenez</u>, Petitioner cites his state post-conviction proceeding where he requested leave to file an out-of-time appeal, namely, a Rule 11 application with the Tennessee Supreme Court that his prior counsel failed to pursue. In that proceeding on April 2004, the state trial court granted that request and allowed Petitioner to file the Rule 11 application. (Docket Entry No. 17-22, at 114-26; Docket Entry No. 13-2, Order of May 7, 2004;and Docket Entry No. 13-3, State's Notice.) On November 15, 2004, the Tennessee Supreme Court denied Morrow's Rule 11 application. Petitioner argues that under <u>Jiminez</u>, the Tennessee Supreme Court's November 15, 2004 Order reset the AEDPA limitation period. By case law, ninety (90) days is

4

added after the date of the last State Court decision on appeal to reflect the ninety day period for a petition to the Supreme Court during the direct appeal process. Abela v. Martin, 348 F.3d 164, 172-73 (6th Cir 2003) (en banc). With the (90) days, Petitioner contends that the federal habeas limitations period was tolled until February 14, 2005, the date that Petitioner's state conviction was "final" for purposes of 28 U.S.C. § 2244(d)(1)(A). As of February 14, 2005, Petitioner cites his then pending state post-conviction petition that is cited as tolling the AEPDA limitation period. On July 11, 2006, the state trial judge denied Petitioner's state post conviction petition and the Tennessee appellate court affirmed that order on July 11, 2006. Petitioner filed this action on October 6, 2006 and contends that this action is timely under Jimenez.

As to his motion for relief under Martinez, Petitioner cites its holding that "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." 132 S. Ct. at 1320. Citing Martinez, Petitioner argues that his ineffective assistance of trial counsel claims for trial and/or post conviction counsel's failures to interview and to call Octavious Burks, a witness at the scene who purportedly could impeach the State's key witness's testimony about the attempted kidnapping charge. Petitioner contends that applicable Tennessee law now bars this claim and that neither Petitioner's trial nor state post conviction counsel presented this claim to the Tennessee courts. Respondent argues that Martinez does not apply to Tennessee's system and thus, Petitioner's claims were procedurally defaulted and any omission of post conviction counsel could not excuse those defaults. Thus, Respondent opposed the evidentiary hearing.

Where, as here, Petitioner presents a federal habeas claim that was not presented to the State

5

courts, the "Procedural Default Doctrine" may bar consideration of the federal habeas claim. Coleman, 501 U.S.722, 729-30,(1992) The rationale for this doctrine arises out of federal respect for federalism and maintaining comity with state courts. Id. at 730-32. State procedural rules also serve a legitimate state interest in finality of criminal convictions.Francis v. Henderson, 425 U.S. 536, 542(1976) In Murray v. Carrier, 477 U.S. 478, 490-91 (1986), the Supreme Court explained that state procedural rules channel the controversy to the state trial and appellate courts.

Martinez "qualifies Coleman by recognizing a narrow exception: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 132 S. Ct. at 1315. There, the Supreme Court defined "initial-review collateral proceedings" as proceedings "which provide the first occasion to raise a claim of ineffective assistance at trial." Id. The Supreme Court then explained that:

> The rule of Coleman governs in all but the limited circumstances recognized here. The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts. It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons.

> In addition, the limited nature of the qualification to Coleman adopted here reflects the importance of the right to the effective assistance of trial counsel and Arizona's decision to bar defendants from raising ineffective assistance claims on direct appeal. Our holding here addresses only the constitutional claims presented in this case, where the State barred the defendant from raising the claims on direct appeal.

Id. at 1320. (citations omitted). To be sure, Martinez exception was stated to apply only to those states which "deliberately choos[e] to move trial-ineffectiveness claims outside the direct appeal

process, where counsel is constitutionally guaranteed." Id. at 1318[1].

On whether Tennessee's system falls within the Martinez exception, District Judges in two districts in Tennessee concluded that Tennessee does not qualify for the Martinez exception. Rahman v Carpenter, No. 3:96cv 0380, 2013 WL 3865071 at * 6 (M. D. Tenn.  July 25, 2013); Sutton v. Colson, No. 3:07–cv–00030 (E.D.Tenn. Sept. 20, 2012). To be sure, the Tennessee Supreme Court reversed a conviction on direct appeal based upon an ineffective assistance of counsel claim where the trial court held an evidentiary hearing on that claim State v. Honeycutt, 54 S.W.3d 762, 766–69 (Tenn.2001). Other Tennessee appellate courts have done so. See State v. Smith, No. E2010–00549–CCA–R3–CD, 2011 Tenn.Crim.App. LEXIS 830, at *35 (Tenn.Crim.App. Nov. 14, 2011); State v. Young, No. E2010–00849–CCA–R3–CD, 2011 Tenn.Crim.App. LEXIS 823, at *34, 2011 WL 5517281 (Tenn.Crim.App. Nov. 9, 2011); State v. Braxton, No. M2009–01735–CCA–R3–CD, 2011 Tenn. Ct. Crim. App. LEXIS 674, at *50, 2011 WL 3809773 (Tenn.Crim.App. Aug. 26, 2011).

Yet, Tennessee has a hybrid approach to ineffective assistance of counsel claims and the above cited state decisions appear to be exceptions as Tennessee courts discourage consideration of ineffective assistance of counsel claims on direct appeal, given the preferable evidentiary mechanisms available  in post-conviction proceedings. State v. Blackmon, 78 S.W.3d 322, 328–29 (Tenn. Ct. Crim. App.2001) ("ineffective assistance of counsel claims should normally be raised by

---

[1]See also, Banks v. Workman, 692 F.3d 1133, 2012 WL 3834733 *13 (10th Cir.2012) ( Martinez applies only when "the State barred the defendant from raising the claims on direct appeal," so that post-conviction proceedings are the petitioner's first opportunity to present the claim); Ibarra v. Thaler, 687 F.3d 222, 227 (5th Cir.2012) ("Ibarra is not entitled to the benefit of Martinez for his ineffectiveness claims, as Texas procedures entitled him to review through counseled motions for new trial and direct appeal."); Dansby v. Norris, 682 F.3d 711, 729 (8th Cir.2012) ( "Martinez does not apply here, because Arkansas does not bar a defendant from raising claims of ineffective assistance of trial counsel on direct appeal).

7

petition for post-conviction relief). In Tennessee, "ineffective assistance of counsel claims should normally be raised by petition for post-conviction relief". Blackmon, 78 S.W.3d at 328–29 because raising the claim "on direct appeal is risky," Young v. State, 2010 WL 2291086 at *2 n. 1 (Tenn. Ct. Crim. App. June 8, 2010), and "fraught with peril[.]" Monroe, 2012 WL 2367401 at *4.

In Martinez, the Supreme Court expressly recognized that "[d]irect appeals, without evidentiary hearings, may not be as effective as other proceedings for developing the factual basis for the [ineffective assistance of trial counsel] claim." 132 S.Ct. at 1318. This statement in Martinez is in accord with the Tennessee Court of Criminal Appeals observation that "ineffective assistance of counsel claims should normally be raised by petition for post-conviction relief". Blackmon, 78 S.W.3d at 328–29, In Fenton, citing Tennessee's hybrid system for presenting ineffective assistance of counsel claim and the equitable nature of the Martinez exception, this member of the Court concluded that Tennessee qualifies for the Martinez exception, but only if the facts underlying the ineffective assistance of counsel claim were not known at the time of the Petitioner's trial.

> Given Martinez' s equitable approach and Tennessee courts' preference for these ineffective assistance of counsel claims being asserted in state post conviction proceedings, **the Court concludes that Martinez' s application to Tennessee's post-conviction system should be based upon the facts of each case, namely whether the facts underlying this type of the new claim were reasonably known to Petitioner or his trial counsel during the trial to enable so as Petitioner or his counsel to preserve the issue for the trial record and his direct appeal. This fact based approach to Martinez' s application would discourage any attempted sabotage of the state trial and direct appeal process by Petitioner withholding proof that may later cause a conviction to be set aside.** There are not any facts to establish here that Petitioner or his trial or post-conviction counsel knew of McNeal's testimony about Graves's exculpatory statement that his younger brother robbed and beat him. Thus, applying Martinez' s equitable rule, the Court concludes that Petitioner has shown cause for this procedural default.

Fenton, 2013 WL 704317 at * 12 (emphasis added)

Months later in Trevino v. Thaler, 133 S. Ct. 1911 (2013) the Supreme Court extended Martinez exception to the procedural default doctrine where State law "does not expressly require

8

the defendant to raise a claim of ineffective assistance of trial counsel in an initial collateral review proceeding. Rather Texas law on its face appears to permit (but not require) the defendant to raise the claim on direct appeals". Id at 1915. In Trevino, the Supreme Court first identified the Martinez rationale

> Martinez argued that his lawyer should have raised, but did not raise, his claim of ineffective assistance of trial counsel during state collateral review proceedings. Id., at ——, 132 S.Ct., at 1214–1315. He added that this failure, itself amounting to ineffective assistance, was the "cause" of, and ought to excuse, his procedural default. Id., at ——, 132 S.Ct., at 1314–1315. But this Court had previously held that "[n]egligence on the part of a prisoner's postconviction attorney does not qualify as 'cause,' " primarily because a "principal" such as the prisoner, "bears the risk of negligent conduct on the part of his agent," the attorney. Maples v. Thomas, 565 U.S. ——, ——, 132 S.Ct. 912, 922, 181 L.Ed.2d 807 (2012) (quoting Coleman, supra, at 753–754, 111 S.Ct. 2546; emphasis added). **Martinez, in effect, argued for an exception to Coleman 's broad statement of the law.**

> **We ultimately held that a "narrow exception" should "modify the unqualified statement in Coleman that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default." Martinez, 566 U.S., at ——, 132 S.Ct., at 1315. We did so for three reasons. First, the "right to the effective assistance of counsel at trial is a bedrock principle in our justice system.... Indeed, the right to counsel is the foundation for our adversary system."** Id., at ——, 132 S.Ct., at 1317.

> **Second, ineffective assistance of counsel on direct appellate review could amount to "cause," excusing a defendant's failure to raise (and thus procedurally defaulting) a constitutional claim. Id., at ——, 132 S.Ct., at 1316–1317. But States often have good reasons for initially reviewing claims of ineffective assistance of trial counsel during state collateral proceedings rather than on direct appellate review. Id., at ——, 132 S.Ct., at 1317–1318. That is because review of such a claim normally requires a different attorney, because it \*1918 often "depend[s] on evidence outside the trial record," and because efforts to expand the record on direct appeal may run afoul of "[a]bbreviated deadlines," depriving the new attorney of "adequate time ... to investigate the ineffective-assistance claim."** Id., at ——, 132 S.Ct., at 1318.

> **Third, where the State consequently channels initial review of this constitutional claim to collateral proceedings, a lawyer's failure to raise an ineffective-assistance-of-trial-counsel claim during initial-review collateral proceedings, could (were Coleman read broadly) deprive a defendant of any review of that claim at all.** Martinez, supra, at ——, 132 S.Ct., at 1316.

9

**We consequently read Coleman as containing an exception, allowing a federal habeas court to find "cause," thereby excusing a defendant's procedural default, where (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] ... be raised in an initial-review collateral proceeding." Martinez, supra, at ——, 132 S.Ct., at 1318–1319, 1320–1321.**

Id. at 1917-18 (emphasis added)

In Trevino, "Texas state law does not say 'must'. It does not on its face require a defendant initially to raise an ineffective-assistance-of-trial-counsel claim in a state collateral review proceeding. Rather, that law appears at first glance to permit (but not require) the defendant initially to raise a claim of ineffective assistance of trial counsel on direct appeal. The structure and design of the Texas system in actual operation, however, make it "virtually impossible" for an ineffective assistance claim to be presented on direct review." Id. at 1915. The Supreme Court posed the question as follows:

Does this difference matter?

**Two characteristics of the relevant Texas procedures lead us to conclude that it should not make a difference in respect to the application of Martinez. First, Texas procedure makes it "virtually impossible for appellate counsel to adequately present an ineffective assistance [of trial counsel] claim" on direct review.** Robinson, 16 S.W.3d, at 810–811. As the Texas Court of Criminal Appeals itself has pointed out, "the inherent nature of most ineffective assistance" of trial counsel "claims" means that the trial court record will often fail to "contai[n] the information necessary to substantiate" the claim. Ex parte Torres, 943 S.W.2d 469, 475 (1997) (en banc).

**[The] motion-for-new-trial "vehicle is often inadequate because of time constraints and because the trial record has generally not been transcribed at this point." Torres, supra, at 475. See Tex. Rule App. Proc. 21.4 (2013) ... Thus, as the Court of Criminal Appeals has concluded, in Texas "a writ of habeas corpus" issued in state collateral proceedings ordinarily "is essential to gathering the facts necessary to ... evaluate ... [ineffective-assistance-of-trial-counsel] claims." \*1919** Torres, supra, at 475. See Robinson, supra, at 810–811 (noting that there is "not generally a realistic opportunity to

10

adequately develop the record for appeal in post-trial motions" and that "[t]he time requirements for filing and presenting a motion for new trial would have made it virtually impossible for appellate counsel to adequately present an ineffective assistance claim to the trial court").

* * *

**This opinion considers whether, as a systematic matter, Texas affords meaningful review of a claim of ineffective assistance of trial counsel.** The present capital case illustrates why it does not. The trial court appointed new counsel for Trevino eight days after sentencing. Counsel thus had 22 days to decide whether, and on what grounds, to make a motion for a new trial. She then may have had an additional 45 days to provide support for the motion but without the help of a transcript (which did not become available until much later—seven months after the trial). It would have been difficult, perhaps impossible, within that time frame to investigate Trevino's background, determine whether trial counsel had adequately done so, and then develop evidence about additional mitigating background circumstances. See Reyes, supra, at 816 ("[M]otions for new trial [must] be supported by affidavit ... specifically showing the truth of the grounds of attack").

Second, were <u>Martinez</u> **not to apply, the Texas procedural system would create significant unfairness. That is because Texas courts in effect have directed defendants to raise claims of ineffective assistance of trial counsel on collateral, rather than on direct, review. As noted, they have explained why direct review proceedings are likely inadequate. See supra, at 1918 – 1919. They have held that failure to raise the claim on direct review does not bar the defendant from raising the claim in collateral proceedings.** ...They have held that the defendant's decision to raise the claim on direct review does not bar the defendant from also raising the claim in collateral proceedings.. They have suggested that appellate counsel's failure to raise the claim on direct review does not constitute "ineffective assistance of counsel." .. Texas' highest criminal court has explicitly stated that "[a]s a general rule" the defendant "should not raise an issue of ineffective assistance of counsel on direct appeal," but rather in collateral review proceedings. Mata v. State, 226 S.W.3d 425, 430, n. 14 (2007) (internal quotation marks omitted).

The criminal bar, not surprisingly, has taken this strong judicial advice seriously...Texas now can point to only a comparatively small number of cases in which a defendant has used the motion-for-a-new-trial mechanism to expand the record on appeal and then received a hearing on his ineffective-assistance-of-trial-counsel claim on direct appeal.. And, of those, precisely one case involves trial counsel's investigative failures of the kind at issue here.. How could federal law deny defendants the benefit of Martinez solely because of the existence of a theoretically available procedural alternative, namely direct appellate review, that Texas procedures render so difficult, and in the typical case all but impossible, to use successfully, and which Texas courts so strongly discourage defendants from using?

**... We do not believe that this, or other, special, rarely used procedural possibilities can overcome the Texas courts' own well-supported determination that collateral review**

11

**normally constitutes the preferred—and indeed as a practical matter, the only—method for raising an ineffective-assistance-of-trial-counsel claim.**

Respondent further argues that there is no equitable problem to be solved in Texas because if counsel fails to bring a substantial claim of ineffective assistance of trial counsel on direct appeal, the ineffectiveness of appellate counsel may constitute cause to excuse the procedural default. See Murray v. Carrier, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). But respondent points to no case in which such a failure by appellate counsel has been deemed constitutionally ineffective. And that lack of authority is not surprising given the fact that the Texas Court of Criminal Appeals has directed defendants to bring such claims on collateral review.

For the reasons just stated, **we believe that the Texas procedural system—as a matter of its structure, design, and operation—does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal.** What the Arizona law prohibited by explicit terms, Texas law precludes as a matter of course. And, that being so, we can find no significant difference between this case and Martinez. The very factors that led this Court to create a narrow exception to Coleman in Martinez similarly argue for the application of that exception here.

**The right involved—adequate assistance of counsel at trial—is similarly and critically important. In both instances practical considerations, such as the need for a new lawyer, the need to expand the trial court record, and the need for sufficient time to develop the claim, argue strongly for initial consideration of the claim during collateral, rather than on direct, review.** See Martinez, 566 U.S., at ——, 132 S.Ct., at 1318. In both instances failure to consider a lawyer's "ineffectiveness" during an initial-review collateral proceeding as a potential "cause" for excusing a procedural default will deprive the defendant of any opportunity at all for review of an ineffective-assistance-of-trial-counsel claim. See Martinez, supra, at ——, 132 S.Ct., at 1316.

**Thus, for present purposes, a distinction between (1) a State that denies permission to raise the claim on direct appeal and (2) a State that in theory grants permission but, as a matter of procedural design and systemic operation, denies a meaningful opportunity to do so is a distinction without a difference. In saying this, we do not (any more than we did in Martinez ) seek to encourage States to tailor direct appeals so that they provide a fuller opportunity to raise ineffective-assistance-of-trial-counsel claims. That is a matter for the States to decide. And, as we have said, there are often good reasons for hearing the claim initially during collateral proceedings.**

**For these reasons, we conclude that where, as here, state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal, our holding in Martinez applies:**

12

133 S. Ct. at 1918-1921 (citations omitted and emphasis added). In <u>Trevino</u>, as here, Petitioner had different trial and post conviction counsel as well as different federal habeas counsel who raised an ineffective assistance of counsel claim that was not raised in the direct appeal nor in the state post conviction proceedings. <u>Id</u>. at 1915-16.

Absent a controlling Sixth Circuit decision[2] and based upon its analysis of Tennessee's system, the Court adheres to its view in <u>Fenton</u> that is consistent with <u>Trevino</u>, namely that Tennessee's system by "design and operation makes it **highly unlikely** in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal" 133 S. Ct. at 1921 (emphasis added). Thus, for the typical case in Tennessee's system, the post conviction proceedings is the principal and most effective procedure to first raise an ineffective assistance of counsel claim. Thus, the Court concluded that an evidentiary hearing was necessary on whether Petitioner's claim for ineffective assistance of his trial and/or post conviction counsel can excuse Petitioner's procedural defaults.

### B. Findings of Fact

### 1. Review of the State Record

In Petitioner's direct appeal, the Tennessee Court of Criminal Appeals made extensive findings of fact[3] underlying Petitioner's convictions and those findings are set forth below:.

---

[2] See  <u>Hodges v. Colson</u>, 711 F.3d 589, 603 (6th Cir. 2013) ("Under <u>Martinez</u> 's unambiguous holding our previous understanding of <u>Coleman</u> in this regard is still the law—ineffective assistance of post-conviction counsel cannot supply cause for procedural default of a claim of ineffective assistance of appellate counsel. See, e.g., Landrum, 625 F.3d at 919. Moreover, 28 U.S.C. § 2254(i) bars a claim of ineffective assistance of post-conviction counsel as a separate ground for relief). <u>Trevino</u> was not addressed in <u>Hodges</u>

[3] State appellate court findings can constitute factual findings under 28 U.S.C. § 2254(e). <u>Sumner v. Mata</u>, 449 U.S.539, 546-47 (1981).

13

On January 14, 1995, Michael and Hannah Westerman were traveling from their home in Kentucky to Springfield, Tennessee, to do some shopping and have dinner. From the back of the Westermans' Chevrolet pick-up truck flew a Confederate battle flag, which was attached to a pole mounted on the truck's tool box. On their way to Springfield, the Westermans stopped at Janie's Market in Guthrie, Kentucky, to get some gas. Mr. Westerman paid for the gas, and while he and Mrs. Westerman sat in the truck talking, Mrs. Westerman noticed a black man in a dark blue car pointing at them.

Mr. Westerman pulled the truck onto the road, and as they crossed into Tennessee,  Mrs. Westerman noticed two (2) cars, one light blue and the other dark blue, following them. Mr. Westerman passed a car in front of them, and both blue cars were able to catch up with the Westermans. Although the Westermans' truck was traveling at approximately 85 miles per hour, the light blue car began to pass them on the left. Mr. Westerman pushed Mrs. Westerman on the floorboard of the truck as the car passed them. After the car passed, Mrs. Westerman sat up in her seat, and Mr. Westerman told her that he had been shot.

Mrs. Westerman climbed over to the driver's side so that she could drive the truck. Suddenly, the light blue car came to a complete stop in the middle of the road in front of the Westermans' truck, and Mrs. Westerman saw a black man sitting in the car pointing a gun at the truck. The dark blue car which had been following the Westermans completely stopped behind the Westerman vehicle, and Mrs. Westerman was forced to drive through a ditch, across an embankment and into a parking lot in an attempt to flee the scene. However, because the two cars had blocked her access to the paved driveways into the parking lot, Mrs. Westerman had to cross another ditch in order to exit the parking lot. Mrs. Westerman then proceeded in the opposite direction, towards Guthrie, in an effort to seek medical attention for her husband and avoid further confrontation with the individuals in the blue cars. Mr. Westerman died the next day at Vanderbilt Hospital as a result of a gunshot wound to the heart.

Shortly after the incident, the police developed appellant Darden as a suspect in the shooting. While law enforcement authorities were conducting an interview with Darden concerning the incident, appellant Morrow appeared at the police station and confessed to the shooting. In his statement to the police, Morrow acknowledged that he was a passenger in Darden's car when he shot several times at the Westermans' truck. He stated that they chased the Westermans after someone in the truck shook the Confederate flag at them and shouted a racial epithet.

At the time the incident occurred, both Morrow and Darden were seventeen (17) years of age. Tony Andrews and Marcus Merriweather, other passengers in Darden's car during the incident, were also juveniles. Andrews was seventeen (17) years of age, and Merriweather was fifteen (15) years of age. All four were charged in juvenile court with the delinquent act of premeditated first degree murder, and upon a transfer hearing in that court, were transferred to the Robertson County Circuit Court to be tried as adults.

14

Subsequently, Darden, Morrow, Andrews and Merriweather were each indicted on one (1) count of civil rights intimidation, one (1) count of premeditated first degree murder, one (1) count of felony murder and one (1) count of attempted aggravated kidnapping. Andrews entered into a plea agreement with the state wherein he pled guilty to criminally negligent homicide and was placed on diversion for two (2) years. Merriweather was tried on the instant offenses in a joint trial with Morrow and Darden.

At trial, Andrews testified for the state. Andrews stated that on the afternoon of the incident, he and Darden were driving around Guthrie in Darden's light blue car. Merriweather and Morrow eventually joined them, and they went to a friend's house so that Darden could collect some money owed to him. While they were sitting in the car, they noticed a red pick-up with a Confederate flag on its toolbox driving by. Subsequently, they saw the pick-up truck parked at Janie's. Darden remarked that he wanted to fight the people in the truck and drove to a local hangout to inform others that he intended to fight the occupants of the truck. The group went back to Janie's, and the truck was still in the parking lot. The truck then began to pull out of the parking lot, and when the truck was beside Darden's car, Morrow rolled his window down and began pointing at the flag. Andrews testified that he then saw someone reach out of the truck's back window and shake the Confederate flag.

Darden's car then pulled out of Janie's parking lot and alongside a car containing Robert Bell, Ricky Williams and Michael Mimms. Octavius Burks and Marcus Darden were in another car behind Bell's. When the Westerman truck began to exit Janie's, Appellant Darden remarked, "there it goes." Bell and Burks began to follow the truck, and the Darden car turned around and followed as well. The Darden car was approximately four (4) cars behind the Westerman truck, and Morrow told Darden to "catch" Bell. At this point, Morrow informed the other occupants of the car that he was armed.

The Darden car caught up with Burks and Bell and eventually passed both cars, putting them directly behind the Westerman truck. Darden's car was traveling approximately 70 to 80 miles per hour, and the truck began to speed up in front of them. Darden began to speed up, and Andrews heard shots fired from the back seat on the driver's side, where Morrow was sitting. Andrews turned around and saw Morrow leaning out of the window firing his gun. Bell was following the Darden car approximately three (3) to four (4) car lengths behind.

Because Morrow's gun jammed, he began fumbling with the weapon. Morrow then told Darden to pass the Westerman truck, and as they started to pass the truck on the left side, Andrews heard another shot fired from the same direction. When the car pulled alongside the Westerman truck, Andrews heard another shot fired from the back passenger seat. After they passed the truck, Andrews noticed that the truck slowed down. Darden began to slow down and then stopped his vehicle in the middle of the road. The truck stopped behind them, and Morrow leaned out of his window, pointed his gun at the truck and exclaimed, "[I've] got them now." The truck veered off into a ditch, and Morrow continued to fire his gun. Eventually, the truck was able to maneuver through the ditch, out of the parking lot and back onto the road proceeding in the opposite direction.

15

Morrow testified on his own behalf at trial. He stated that on the day of the incident, he was carrying a gun for protection because his life had been threatened. He testified that they followed the Westerman truck because all of the occupants in the car were "looking for a fight." Although he acknowledged that they wanted to fight because someone in the truck waved the Confederate flag, he insisted that he did not shoot at the truck because of the flag. Instead, he testified that as Darden began to pass the Westerman truck, Darden, Merriweather and Andrews started yelling, "shoot!" Because of the "pressure" from the others in the car, he started firing his gun into the air. He stated that he never told Darden to stop his car in the road and did not point his gun at the truck when the car was stopped. He further testified that he never intended to harm anyone during the incident.

Appellant Darden also testified for the defense at trial. He claimed that no one in the car discussed fighting with the occupants of the truck. He was offended when someone in the truck shook the flag, but had no intention of shooting anyone. He was chasing the truck to "mess" with its occupants and did not know that Morrow was armed. He denied that anyone in the car coerced Morrow into shooting his weapon. When he heard the gunshots, he assumed that the truck was merely "backfiring." He further denied stopping in the roadway or attempting to "box in" the Westermans' truck.

Morrow, 1998 WL 917802 at ** 1-3.

In his state post conviction appeal, the Tennessee appellate court found the following

facts based upon the evidentiary hearing in the trial court:

In his petition for post-conviction relief and at the hearing, Petitioner argued that trial counsel was ineffective in failing to file a timely petition for application to appeal to the supreme court, in failing to properly advise him regarding his constitutional rights to a jury trial, and in failing to request that the trial judge consider lesser included offenses of premeditated first degree murder and felony murder. He also argued that there was a variance between the indictment and the proof presented at trial in that the evidence did not satisfy the elements of the charge in the indictment. Finally, he argued that he was denied his right to confront his accuser when the trial judge refused to allow his trial counsel to question Ms. Westerman about her affiliation with certain race-related organizations.

Petitioner testified that his case received a lot of publicity, prompting his trial counsel to file a motion for change of venue. The motion contained various newspaper clippings and other things related to the media attention. The motion was presumably filed because the publicity had tainted the available jury pool in Robertson County. According to Petitioner, his trial counsel told him that the trial judge was going to deny the motion for change of venue. He then advised Petitioner to opt for a bench trial because the judge would be more likely to "lean in his favor." He told Petitioner that if he declined a jury trial, the trial judge would likely convict him of criminally negligent homicide and he would be released from prison by his next birthday. Petitioner said that trial counsel did not advise him that the trial judge would grant the motion for change of venue in the event Petitioner wanted a jury trial and a

16

jury could not be selected in Robertson County.

Petitioner did not speak to anyone else about declining a jury trial. He did not know if his mother had discussed this decision with his trial counsel. He requested that his trial counsel speak to his co-defendants and obtain their opinions regarding a bench trial. He said that his trial counsel consistently told him that it would be a good idea to **proceed to trial without a** jury. Although trial counsel never discussed a list of names or possible jury panel members with him, Petitioner said that he received a questionnaire exemplifying the questions that potential jurors would be asked in trying to determine their suitability as jurors.

Petitioner signed a waiver approximately two days before his trial, waiving his right to a trial by jury. He stated that he did not recall signing the waiver, but he identified his signature on the waiver when it was presented to him by counsel. Petitioner initially did not remember speaking with the trial judge about his right to a jury trial and his decision to waive that right. However, after refreshing his memory with the transcript of his trial, he remembered speaking to the judge about waiving his right to a jury trial. He acknowledged that the trial judge told him he had a right to have a twelve member jury decide his case, but he did not recall being advised that he could participate in a jury trial. He also did not remember being told that he had a right to participate in selecting a jury.

Petitioner testified that he would not have waived his right to a jury trial had he known that the trial judge would grant a change of venue if a jury could not be selected. He did not feel like his waiver was an understanding and voluntary waiver because the decision to waive was made without all of the necessary information. Petitioner felt like he was coached into making the decision, that the waiver was signed on "false principles," and that the circumstances were not fully explained to him. He also said that his trial counsel never argued the motion for change of venue and never discussed this decision with Petitioner. Petitioner had completed the ninth grade of high school.

Petitioner testified that his original indictment charged premeditated first degree murder for which he was acquitted. He was not convicted of any lesser included offenses related to this charge. Petitioner said that his trial counsel had discussed the lesser included offense of criminally negligent homicide with him, but trial counsel did not request that the trial court consider lesser included offenses of premeditated first degree murder.

Collier Goodlett testified that he was Petitioner's trial attorney along with his co-counsel, Carlton Lewis. Mr. Goodlett worked at the Public Defender's Office in Clarksville. He recruited Mr. Lewis, an African-American lawyer from Nashville, because he felt that Mr. Lewis's presence would help the jury see Petitioner in a more favorable light. At the time of the post-conviction hearing, Mr. Goodlett's caseload consisted of 95 clients with approximately 130 matters pending before the court. He said that his caseload was "probably equivalent to that" at the time of Petitioner's trial.

Mr. Goodlett agreed that at the time of trial he thought that Petitioner had a "reasonably good shot at criminal[ly] [negligent] homicide," a lesser included offense of premeditated

17

first degree murder. He said that his understanding of the facts, in brief form, were as follows:

Mr. Morrow is with some friends of his. He sees the Westerman truck parked at a little mini mart, and our proof, essentially, was that Mr. Westerman sees them and reaches out through the back window of his truck and sort of shakes the flag at them.

They-both parties part company; ultimately they see the Westerman vehicle again, and the proof, essentially, was they wanted to fight them. And Mr. Morrow was, essentially, going to fire, in sort of nautical terms, a few shots across the [bow]. And, unfortunately, for all the parties concerned, including Mr. Morrow, he had the most horrible luck in the world, and ended up shooting and ultimately killing Mr. Westerman. And I felt like that was-that was part of it.

Mr. Goodlett also indicated that the trial court's comments and questions during a pre-trial conference, in which counsel for both parties were present, led him to believe that it might be in Petitioner's best interest to waive his right to a jury trial. Based on his inferences drawn from the pre-trial conference and what knowledge he had of the jury pool, he advised Petitioner to waive his right to a jury trial. Mr. Goodlett felt that the trial court "would be able to more dispassionately look at the facts of the case and less of all the hoopla that was surrounding this case," and in his opinion, "the route to go was to take the jury out of the mix."

Mr. Goodlett said that he did not find it odd that the judge returned a verdict of not guilty with respect to the charge of premeditated first degree murder and therefore he did not raise the issue on appeal. He agreed that at the time of trial the law required the fact finder to consider all lesser included offenses. He also said that based on comments made during the pre-trial conference, he thought the trial court would consider the facts sufficient to support a conviction of a lesser included offense of premeditated first degree murder. He did not recall whether he specifically asked the judge to consider a lesser included offense, but added that he would certainly have advocated for a lesser culpability than first degree murder. He also stated that it was his opinion that the trial court considered the lesser included offenses, although there was no way to know for sure.

Mr. Goodlett remembered speaking to Petitioner about his "reading" of the jury pool and his feeling about what the court would do regarding the charges against him. He did not recall making any statements to Petitioner about when he would be released from prison should he be convicted of a lesser offense, but he noted that he might have talked about the possible ranges of punishment. According to Mr. Goodlett, he never made any statement to Petitioner that he would be out of prison by his next birthday, and none of the sentences contemplated were shorter than a year.

Mr. Goodlett admitted that he was concerned about Petitioner receiving a fair trial in Robertson County, and that concern primarily arose out of the "circus atmosphere" that

18

surrounded the case. According to Mr. Goodlett, some people considered Mr. Westerman's death "the last debt in the civil war." He explained that there was extensive publicity and such groups as the Sons of the Confederate Veterans had representatives in the courtroom on more than one occasion. Mr. Goodlett recalled that he reviewed questionnaires for a jury panel and interviewed a jury expert who advised him that "this pool was not a pool before whom [Mr. Goodlett] wanted to try this case." He remembered very few African-Americans being members of the jury pool. Mr. Goodlett said that it might have been prudent to argue the change of venue motion. However, given the law on change of venue and judicial inclination, he said, "I felt like I had the best deal with who was going to be sitting on the bench, and I wanted to take my chances with the court as opposed to a jury no matter where."

Mr. Goodlett did not remember telling Petitioner that the judge was not going to grant a change of venue. He likewise did not remember discussing the law on change of venue with Petitioner. Mr. Goodlett challenged the sufficiency of the evidence on appeal because it was his view that what occurred during the incident did not constitute an attempted kidnapping. He said that he did not address a variance between the indictment and the proof at trial because pursuant to motion practice and discovery he determined that the State's proof tracked the indictment and did not constitute a variance.

On cross-examination, Mr. Goodlett said that he stood by his trial work and the effort he put into Petitioner's case, and he felt like he provided effective assistance of counsel. He said that if he could do something over with respect to the case, he would have sought funds to procure the car door from the car Petitioner was riding in during the incident. He explained that had he done so, he might have better demonstrated to the jury that Defendant could not have aimed the gun at Mr. Westerman from his position in the car, which would have further emphasized how "horribly unlucky this whole event was."

Mr. Goodlett identified the petition for waiver of trial by jury which was signed by Petitioner, Mr. Goodlett, Mr. Lewis, and the trial judge. He did not remember where they were when the document was signed. He also did not remember a colloquy between the trial court and Petitioner establishing an oral waiver of Petitioner's right to a jury trial. However, after refreshing his memory with a portion of the transcript, Mr. Goodlett recalled that Petitioner acknowledged to the trial judge that he was knowingly and freely waiving his right to a jury trial and that he understood what he was doing.

According to Mr. Goodlett, he never explicitly told Petitioner that the judge would find him guilty of criminally negligent homicide. Mr. Goodlett said that he did not speak to Petitioner in terms of the constitutional right to a jury trial, but explained to him that his best chance of avoiding a verdict of premeditated murder, or any first degree murder charge, including felony murder, would be a bench trial. He said he felt like Petitioner knew what he was doing when he told the trial judge that he wanted to waive his right to a jury trial, and he likewise felt that Petitioner knew what he was doing when he signed the petition waiving that right.

19

Charles Damien Darden, one of Petitioner's co-defendants, testified that while awaiting trial in the Robertson County Jail, he and Petitioner participated in a conversation with their trial attorneys regarding the merits of a bench trial versus a jury trial. He said that during that conversation, Mr. Goodlett told Mr. Darden and Petitioner that if they waived a jury trial they had a better chance of getting out of the penitentiary before their next birthdays.

William Goodman represented Petitioner's co-defendant, Marcus Merriweather, at trial. Mr. Goodman recalled discussions about waiving a jury trial in favor of a bench trial. He explained that the possible jury pool contained approximately two African-Americans, and the case had already received a lot of publicity by the time the pool was gathered. According to Mr. Goodman, the limited jury pool and the heightened publicity made a bench trial the best option for adjudication.

Mr. Goodman's notes reflected that the change of venue motion was argued, and that the trial judge reserved judgment pending jury selection. Once all of the co-defendants waived a jury trial, the change of venue motion was moot, although it was still pending before the court. It was Mr. Goodman's understanding that had an acceptable jury been impaneled in Robertson County the defendants would have proceeded with a jury trial. However, if a jury could not be successfully impaneled, the change of venue motion would have been granted.

The post-conviction court found that the evidence did not support Petitioner's claim that trial counsel was ineffective in advising him to waive his right to a jury trial. The post-conviction court also found that the trial judge did not err by "failing to articulate on the record all of the lesser included offenses that he considered in rendering his judgment." On appeal, Petitioner argues that the post-conviction court erred when it determined that he was not entitled to post-conviction relief because (1) Petitioner did not knowingly, voluntarily, and intelligently waive his right to a jury trial, and (2) the trial court, sitting without a jury, failed to consider lesser included offenses of felony murder and premeditated first degree murder.

Morrow v State, No. M2005-00554-CCA-R3-PC, 2006 WL 1931698 at ** 4-8 (Tenn. Ct. Crim. App. July 11, 2006)

### 2. The Martinez Hearing

The evidentiary hearing on the Martinez issue focused on the significance of the testimony of Octavius Burks whom Petitioner contends should have been interviewed and called as a defense witness at Petitioner's trial and/or state post conviction hearing. According to Petitioner, Burks was a witness at the stopping of the victims' truck on a highway by the vehicle in which Petitioner was a passenger. Set forth below are the finding based on Burks's testimon and the testimony of

20

Petitioner's trial and state post conviction counsel about their evaluations of the significance of Burks' testimony to Petitioner's defense at trial.

### a. Burks

Octavious Burks testified about that there were reports of a man who was seen at a local market in Guthrie, Tennessee driving a truck with a rebel flag, yelling the "n" word and asking for a fight. (Docket Entry No. 92, Transcript at 2)7. Three vehicles that were driven by Burks, Robert Bell and Damien Darden followed this truck with the rebel flag. Petitioner was a passenger in Darden's vehicle, the lead vehicle. Burks's vehicle was third behind Bell's vehicle. Id. Burks was expected a fight.

On the highway toward Springfield, Tennessee, Burks's vehicle lagged behind the Bell and Darden vehicles. Id at 28. Near the town of Sadlersville, Burks who was at some distance behind the Bell vehicle, testified that "Bell stopped in the middle of the road". Id. 28, 36. Burks described Bell's vehicle as "in the middle of the road where cars don't normally stop". Id at 29. Upon Burks's arrival at the scene, Burks's vehicle was in behind Bell's vehicle that was behind the truck with the rebel flag with Darden's vehicle in front of the truck. Id. 28, 35

At the federal hearing, Burks testified that the vehicles in front of him stopped for "[j]ust a couple of seconds." Id. In his signed statement to the police shortly after the incident, Burks told the officers that the vehicles in front of him stopped for "a minute", but at the Martinez hearing, Burks testified that his reference to "a minute" in his earlier statement to the police, was "a figure of speech". Id. at 29, 34. Yet, Burks admitted that he "saw that Damien [Darden's] car was stopped in front of the truck on highway 41" Id. at 35. At that point, the truck with the rebel flag backed up, turned into a ditch and drove back in the direction of Guthrie. Id. According to Burks, neither of the two vehicles moved and he did not observe anyone leave either vehicle. Id. at 30. Burks states that

21

he was in a position to observe if anyone exited those vehicles. Id. at 31. Burks described the three vehicles as turning into the nearby feed mill parking lot and upon exiting his vehicle and at some point, Burks heard a gunshot. Burks and the other vehicles drove back toward Guthrie. Id.

Burks was never charged with any offense. Burks did not interact with Petitioner nor the persons in Darden's vehicle at any time during these events. Id. at 37. Burks gave a signed statement to the police that was provided to Collier W. Goodlett, one of Petitioner's two trial counsel. Burks testified that Petitioner's trial counsel never contacted or interviewed him. Id. at 32. Burks would have agreed to an interview and if requested, would have testified at Petitioner's trial. Id. at 32-33. Petitioner's name is not mentioned in Burks's signed statement given to the police. Id. at 5, 56 and Petitioner's Exhibit No. 1.

### b. Petitioner's Trial and Appellate Counsel

Collier Goodlett, an assistant state public defender, with Carlton Lewis, represented Petitioner at his state court trial and on his direct appeal. According to Goodlett, for the attempted kidnapping charge, the defense counsel knew that State would present proof that Hannah Westerman was "hemmed up down at the grainery in Sadlersville" with Darden's vehicle "in front" (Docket Entry No. 92 at 6). Goodlett was aware that at the grainery, Bell's and Burks's vehicles were behind the victim's truck in that order. Id. Prior to trial, Goodlett reviewed the statements of Bell and Burks as well as Ricky Williams and Michael Mimms who were also at the scene. Id. at 7 and Petitioner's Exhibits 1 through 4.

Goodlett assessed the Mimms and Williams statements as contradicting any "agreement amongst the young men to try and stop and trap the truck" Id. at 7. Although Goodlett agreed that these witnesses "could have been" favorable, Goodlett did not interview or call any of these witnesses at trial. Id at 8. Goodlett explained that three of the four witnesses had criminal charges

22

and were represented by counsel. Burks was not charged, but Goodlett stated that Burks's "bias was obviously less pronounced". Id at 25. Goodlett could not explain why the defense counsel did not call Burks to contradict Hannah Westerman's testimony for the State "about being blocked in down at the grain bin" Id. at 9. According to Goodlett, Hannah Westerman also described three persons exiting one of the vehicles. Id at 10. Burks testified at the Martinez hearing that he did not observe anyone leave their vehicles.

On cross examination, Goodlett stated that Lewis, his co-counsel, was also aware of Burks's statement prior to trial and did not recommend calling Burks as a defense witness. Defense counsel for the two other co-defendants at Petitioner's trial, did not call Burks as a witness. Goodlett also acknowledged that none of these four witnesses, including Burks, was in the Darden vehicle with Petitioner in front of the truck. Id. at 16, 17-18. Although Goodlett had earlier denied making any strategic decision about calling Burks as a defense witness, Goodlett admitted that the decision on which witnesses to call at trial involves careful decisions evaluating each witness's credibility, the cumulative nature of the testimony and alternate means of proof. Id at 14-15, 23. According to Goodlett, at trial, Petitioner and his two co-defendants and Andrews[4], a state witness and former co-defendant testified that "there was no plan or intent to box in the truck" or block the Westerman truck. Id. at 19-20. Goodlett admitted that Williams and Bell, two of the four witnesses would have contradicted Petitioner on whether there was to be a fight. Id at 22

### c. Petitioner's Post-Conviction Counsel

---

[4]As found by the Tennessee appellate court: " When the car pulled alongside the Westerman truck, Andrews heard another shot fired from the back passenger seat. After they passed the truck, **Andrews noticed that the truck slowed down. Darden began to slow down and then stopped his vehicle in the middle of the road. The truck stopped behind them, and Morrow leaned out of his window, pointed his gun at the truck and exclaimed, "[I've] got them now."** Morrow, 1998 WL 917802 at * 3.

23

William Kroeger was Petitioner's appointed counsel in the state post conviction proceeding. For that proceeding, Kroeger read the trial transcript, trial record, witness statements, including Burks's statement and reviewed defense counsel's file to assess which claims to assert for the post conviction proceeding. (Docket Entry No. 92 at 38). After that review and his legal research, Kroeger filed an amended petition and second amended petition. Id. at 39, 42. In Kroeger's opinion, a pretrial interview with Burks "made sense". Id.. at 39, 43. Kroeger, however, did not interview Burks for the post conviction proceeding because his focus was on the lesser included offenses for the felony murder conviction. Id. at 39-40, 56. Kroeger's concern was that the evidence at trial did not prove kidnapping and viewed the State's proof on that charge to be "weak". Id at 53, 59. Kroeger acknowledged the State's theory for the attempted kidnapping charge was the "blocking" of the truck that was an "important part" of the State's case. Id. at 60. Kroeger "remembered that it [the truck] stopped". Id. at 48, 50-51, 57.

Kroeger would not characterize his decision not to pursue Burks as a strategic decision. Id. at 40. Although Kroeger agreed that if Burks could testify that he did not hear any statements by Petitioner about stopping or blocking the victim's truck, that testimony would be helpful to the defense. Id at 40-41. In that context, Kroeger agreed that an interview of Burks would have been useful and should have been presented in the post conviction proceeding. Id. at 60-61. Yet, Burks was not in the vehicle with Petitioner to observe his mental state or hear any of his statements. According to Kroeger's recollection, there was not any proof that Burks ever spoke to Petitioner during the evening at issue. Id. at 56. Based on his knowledge of Tennessee law, Kroeger agreed that the intent for aggravated kidnapping did not require a prior plan. Id. at 48.

24

At the federal hearing, Kroeger characterized his failures to interview and to call Burks as a witness as "hindsight" Id. at 41, 45. On cross examination, Kroeger described his efforts on Petitioner's behalf in the post conviction proceeding as "zealous" and cited his success in securing a delayed appeal for Petitioner. Id. at 42-43. Kroeger also admitted that a counsel's decision to call a person as a witness at trial requires a careful decision, considering the negatives and positives of each witness. Id. at 49-50.

## C. Conclusions of Law

### 1. Ineffectiveness of Counsel Claims

To prevail on any claim of ineffective assistance of counsel, Petitioner must demonstrate that under the totality of the circumstances, his trial counsel performed deficiently and that counsel's deficient performance resulted in prejudice. Strickland v. Washington, 466 U.S. 668, 695 (1984). As the Supreme Court explained:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687.

As to the "performance" inquiry, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. at 688. Under Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. As to the duty to investigate:

> These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case. As the Court of Appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and **strategic choices after less**

25

**than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation**. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

**The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.** Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Id. at 690-91 (emphasis added).

In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Wiggins v. Smith, 539 U.S. 510, 521 (2005). Counsel's failure "to conduct constitutionally adequate pretrial investigation into potential evidence" can "hamper[] [their] ability to make strategic choices." Harris v. Bell, 417 F.3d 631, 639 (6th Cir. 2005). See also Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991) ("[O]ur case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.").

As to the meaning of "prejudice," the Supreme Court stated that ir was "expressly leaving to future cases further elaboration of the significance of that term." United States v. Frady, 456 U.S. 152, 168(1982) (quoting Wainwright, 433 U.S. at 91). Prejudice can be demonstrated by a showing

26

of ineffective assistance of counsel. Hill v. Lockart, 474 U.S. 52, 58–59 (1985). In Cullen v.

Pinholster, 131 S. Ct. 1388, (2011) , the Supreme court reiterated that a strong presumption of

adequate assistance exists and any deficiency in counsel's performance must undermine confidence

about the conviction.

> In **Strickland**, this Court made clear that "the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation ... [but] simply to ensure that criminal defendants receive a fair trial." 466 U.S., at 689, 104 S.Ct. 2052. Thus, **"[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."** Id., at 686, 104 S.Ct. 2052 (emphasis added). The Court acknowledged that "[t]here are countless ways to provide effective assistance in any given case," and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." Id., at 689, 104 S.Ct. 2052.

> Recognizing the "tempt[ation] for a defendant to second-guess counsel's assistance   after conviction or adverse sentence," ibid., **the Court established that counsel should be "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment,"** id., at 690, 104 S.Ct. 2052 . **To overcome that presumption, a defendant must show that counsel failed to act "reasonabl[y] considering all the circumstances."** Id., at 688, 104 S.Ct. 2052. **The Court cautioned that "[t]he availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges."** Id., at 690, 104 S.Ct. 2052.

> The Court also required that defendants prove prejudice. Id., at 691–692, 104 S.Ct. 2052. **"The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id., at 694, 104 S.Ct. 2052.** "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Ibid. That requires a "substantial," not just "conceivable," likelihood of a different result. Richter, 562 U.S., at ——, 131 S.Ct., at 791.

Id. at 1403 (emphasis added).

As to the cited deficiencies in Petitioner's trial counsel's and post conviction counsel's

representation, Petitioner cites their failures to interview and to call Burks as a witness for either

proceeding. Goodlett and Kroeger reviewed Burks's signed statement to the police about his

27

knowledge about this crime. Their review also included other witnesses' statements. In addition,

Kroeger reviewed the trial testimony and exhibits and declined to call Burks as a witness for the

post conviction proceeding. As to the cited importance of Burks's testimony, Burks did not observe

anyone exit the Darden vehicle that was in front of the Westerman truck. Burks's observation is

asserted to be probative evidence of whether there was an attempt to kidnap the Westermans. The

other suggested significance attached to Burks's testimony is that he did not hear any statement by

Petitioner or the others suggestive of a plan to kidnap Westerman truck. As to the latter testimony,

the proof was that Burks was not in or near the Darden vehicle at the grainery and did not have any

communications with Petitioner nor observe Petitioner that evening. Petitioner is not mentioned in

Burks's statement to the police. As discussed below, the lack of any statements by Petitioner about

a plan to kidnap is not required for Tennessee law.

As to Burks's testimony about not seeing anyone exit the Darden vehicle as Mrs.

Westerman testified, the significance of this purported conflict turns upon the other proof at trial

and the relevant Tennessee law. Both issues were addressed by the Tennessee appellate court on

Petitioner's direct appeal:

> Appellants also challenge the sufficiency of the evidence for their convictions of attempted
> aggravated kidnapping. **Aggravated kidnapping is "false imprisonment ... committed ...
> [w]ith the intent to inflict serious bodily injury on or to terrorize the victim or
> another." Tenn.Code Ann. § 39-13-304(a)(3) (1991). False imprisonment is defined as
> "knowingly remov[ing] or confin[ing] another unlawfully so as to interfere
> substantially with the other's liberty." Tenn.Code Ann. 39-13-302(a) (1991). A criminal
> attempt is committed when a person, "acting with the kind of culpability otherwise
> required for the offense ... [a]cts with intent to cause a result that is an element of the
> offense, and believes the conduct will cause the result without further conduct on the
> person's part." Tenn.Code Ann. § 39-12-101(a)(2) (1991).**
>
> **Hannah Westerman testified that after her husband was shot, the light blue car that
> had passed them came to a complete stop in the roadway in front of them, and another
> car stopped behind them. As a result of this, she was forced to drive the truck through
> a ditch, across an embankment and into a parking lot in an effort to flee the scene.**

28

However, when she tried to exit the parking lot, the cars had blocked her access to the paved driveway, so she drove through another ditch to exit the parking lot. All the while, someone in the light blue car was leaning out of the window pointing a gun at the truck.

Furthermore, **Andrews testified that Darden stopped his car in the middle of the roadway, and Morrow leaned out of the window, pointed his gun at the truck and exclaimed, "[I've] got them now."**

Looking at this evidence in the light most favorable to the state, a rational trier of fact could conclude that appellants attempted to confine the Westermans so as to "interfere substantially" with their liberty and with the intent to inflict serious bodily injury on or to terrorize them. Tenn.Code Ann. §§ 39-13-302(a), 39-13-304(a)(3) (1991). The evidence is sufficient to sustain appellants' convictions for attempted aggravated kidnapping.

This issue is without merit

1998 WL 917802 at **12-13(emphasis added).

With these findings and conclusions, this Court concludes that the critical proof to sustain the attempted kidnapping conviction under Tennessee law was the stopping of the truck by the Darden vehicle and Petitioner's display of the weapon during that stop. .Burks testified that Darden's vehicle stopped in front of the Westerman truck. Goodlett and Kroeger also did not dispute that the State's proof established that the Darden vehicle caused the Westerman vehicle to stop on the highway and diverted the Westermans from their intended course of travel. The undisputed evidence is that the truck had to reverse and turn into a ditch  to travel in the opposite direction. Petitioner testified to his display and shooting of a weapon at the truck during the period of this stop. . These undisputed facts reflect a substantial interference with the Westermans' liberty.

Under these facts, this Court concludes that the Tennessee courts could reasonably conclude that the State's proof was sufficient to prove Petitioner guilty of attempted kidnapping. In this factual setting, the Tennessee courts' conclusions render any testimony about whether anyone exited the Darden vehicle immaterial. Although Goodlett and Kroeger do not concede that their

29

failures to pursue Burks as a witness were strategic decisions, both Goodlett and particularly Kroeger had the benefit of the entire record and obviously did not consider Burks to be a critical witness. Goodleett's co-counsel at trial also had Burks's statement and did not deem Burks's testimony necessary for trial. Counsel for Petitioner's co-defendants at trial did not call Burks as a defense witness. Petitioner's trial and post conviction's counsel's failures to call Burks as a witness at trial, were made after a review of the State's proof and constituted strategic decisions. There was testimony from several witnesses about the circumstances of the stopping of the Westerman truck at the grainery, including Andrews who was a passenger in Darden's vehicle. Burks was an active follower of the Darden truck. In sum, upon review of the state record, the State courts' findings of facts and the proof at the <u>Martinez</u> haring, this Court concludes that Petitioner was not prejudiced as the result of trial or post conviction counsel's failures to call Burks as a witness at trial or during the post conviction proceedings. Thus, Petitioner's ineffective assistance of counsel claims about his trial and post conviction counsel does not prove cause or prejudice to excuse any procedural default or to prove grounds for habeas relief under the Sixth Amendment

### 2. Actual Innocence Claim

To the extent, Petitioner asserts that his proof establishes his actual innocence to excuse his procedural defaults, the actual innocence doctrine requires a showing of a fundamental miscarriage of justice. <u>Sawyer v. Whitley</u>, 505 U.S. 333, 339 (1992). For habeas relief, proof of actual innocence "must be truly persuasive" or "extraordinarily high" to demonstrate a "constitutionally intolerable event" as well as the lack of an available state remedy. <u>Herrera v. Collins</u>, 506 U.S. 390, 417, 427 (1993) In a word, "the miscarriage of justice exception is concerned with actual as compared to legal innocence," <u>Sawyer</u>, 505 U.S. at 339 and the Court must determine whether "refusal to consider the defaulted claim on federal habeas carries with it the risk of a manifest

30

miscarriage of justice." <u>Smith v. Murray</u>, 477 U.S. 527, 538 (1986). A petitioner fails to persuade a federal court to look past the cause and prejudice test for procedural default "[w]hen the alleged error is unrelated to innocence, and when the defendant was represented by competent counsel, had a full and fair opportunity to press his claim in the state system, and yet failed to do so in violation of a legitimate rule of procedure." <u>Id.</u> . Given the state appellate court's findings and conclusions on the requisite proof for attempted kidnapping, the Court concludes that there is not basis for Petitioner's actual innocence or a miscarriage of justice

For these reasons, the Court concludes that Petitioner cannot establish prejudice or cause for his trial or post conviction's counsel's failure to interview and call Burks as a witness at trial or for the post conviction hearing. Petitioner's proof does not establish any prejudicial deficiency of Petitioner's trial counsel's failures to do so. There was not any other proof to excuse Petitioner's procedural defaults. Petitioner did not submit any proof on his claim about the trial judge. Thus, the Court concludes that the petition for the writ of habeas corpus should be denied .

An appropriate Order is filed herewith.

**ENTERED** this the ___6ᵗʰ___ day of January, 2014.

William J. Haynes, Jr.
Chief United States District Judge

31